JUDE G. GRAVOIS, Judge.
| ¡.Defendant, Jarrod D. Henry, appeals his conviction of manslaughter, a violation of La. R.S. 14:31. On appeal, he argues that the evidence was insufficient to convict him because he was identified by a witness who lacked credibility, and further that other particular suspects were or should have been developed. We find that defendant’s assignments of error are without merit, and thus affirm his conviction and sentence. The matter is remanded to the trial court for correction of the commitments.

PROCEDURAL HISTORY

On November 5, 2009, a Jefferson Parish Grand Jury indicted defendant, Jarrod *704 D. Henry (a/k/a “Hustle Henry”), for the second degree murder of Mr. Umar Ervin in violation of La. R.S. 14:30.1. Defendant was arraigned the following day and pled not guilty to the charge. On November 8, 2012, defendant proceeded to trial, and on November 10, 2012, a 12-person jury returned a verdict of guilty to the responsive verdict of manslaughter. Defendant’s motion for a new trial was | ^denied on January 18, 2013. Also on January 18, 2013, defendant was sentenced to 40 years imprisonment with the Department of Corrections. He orally moved for an appeal, and filed a written motion for an appeal on January 29, 2013, which was granted the following day.[1]
On February 6, 2013, a habitual offender bill of information was filed against defendant, alleging that he was a second felony offender with a predicate conviction of possession of cocaine.[2] On May 24, 2013, defendant admitted to being a second felony offender, his original sentence was vacated, and he was sentenced to 40 years imprisonment at hard labor to be served without the benefit of probation or suspension of sentence. Defendant moved that his habitual offender adjudication and sentence be merged into his appeal.

FACTS

The testimony and evidence presented at defendant’s trial showed that the victim, 27-year-old Umar Ervin, lived at 1304 Lo-chlomand Drive in the Scotsdale Subdivision in Harvey, Louisiana, on the west bank of Jefferson Parish, in a home that belonged to his mother, Andralla Slayton.[3] He was shot while he was in his backyard and died moments later on the front porch of a neighbor’s house. Several days before he was killed, Mr. Ervin had discovered a cache of guns and ammunition in his backyard behind a shed. He had told his mother and a friend who was a New Orleans police officer about the guns, asking both of them what he should do about them; he was afraid that if he was seen moving the guns, he could be harmed.
[4On May 21, 2009, Gretchen Moten was living at 1312 Lochlomand Drive, two doors down from Ms. Slayton’s house. She knew Ms. Slayton’s children, including Mr. Ervin, the victim, who she described as being a quiet individual who she never had any problems with. She testified that on this date, she and her husband were awakened by the sound of gunfire. Within a minute or so, at about 5:30 a.m., she heard her front doorbell ring. She went to the door and asked who it was, but got no response. She then called 9-1-1. The police arrived shortly thereafter and found Mr. Ervin lying on her porch.[4] Mrs. Mo-ten testified that she was afraid to answer her door because of the gunshots she had heard, but said that had she known that it was Mr. Ervin at her door, she would have opened the door.
*705 Deputy Nicholas Davidson of the Jefferson Parish Sheriffs Office responded to the call regarding shots being fired in the 1300 block of Lochlomand in Harvey. He was the first deputy to arrive on the scene. Upon his arrival on the street, he heard someone moaning for help from his police vehicle. He then found and observed the victim, who was wearing a mask, lying on Mrs. Moten’s porch, covered in blood. The victim was still alive at that time and had a revolver sticking out of his right front pocket. For safety reasons, Deputy Davidson removed the revolver from the victim’s pocket and tossed it on to the grass near him. The victim was mumbling, and when asked if he knew who had shot him, he answered “no.” After this response, the victim did not speak again. EMS was called, but Mr. Ervin died on Mrs. Moten’s front porch. Deputy Davidson did not ask the victim why he was wearing a mask (which was down and “squashed up under his chin”) or why he had a gun.[5]
| ^Deputy Scott Henning, Jr. was employed by the Jefferson Parish Sheriffs Office on the date of the shooting. At approximately 5:30 a.m. that day, he also responded to the 1300 block of Lochlo-mand after receiving reports that shots had been fired in the area. When Deputy Henning arrived on the scene, he noticed the victim on Mrs. Moten’s porch, a trail of blood leading therefrom, and the revolver in the grass.
The victim’s blood trail was followed from Mrs. Moten’s porch to the side of the house and into the backyard of her residence, then over a fence into the neighbor’s backyard, and then into the backyard of the victim’s house located at 1304 Lo-chlomand. An AK47-type assault rifle and a Mossberg .20 gauge shotgun were discovered near an area where blood was found near a storage-type shed in the victim’s backyard. Three magazines and bullets were also recovered near the shed,[6] which was located next to a wooded, overgrown, grassy area which appeared to have been disturbed. Further, the front door of the victim’s residence was found to be open, but no one was inside.
Detective Kevin Decker of the Jefferson Parish Sheriffs Office testified that he was dispatched to the area at approximately 5:28 a.m. and initially went to 1312 Lochlo-mand where the victim was found. He traced the blood trail back to the victim’s residence at 1304 Lochlomand. He testified that the door of the victim’s house was found to be open when the police arrived, but there were no signs that the house had been gone through or ransacked.[7] He further testified regarding the items found in the victim’s backyard, including a bag, garbage bag, sheet, t-shirt, “rounds” of ammunition, magazines, and guns. He testified that no fingerprints 1¿were recovered from the guns found in the backyard. However, a knit cap found in the yard by the guns was submitted for forensic analysis. The DNA from the cap matched the victim’s DNA. The victim was tested for gunshot residue; the results were pre *706 sumptive negative, indicating that he had not discharged a weapon.
Colonel Timothy Scanlan of the Jefferson Parish Sheriffs Office testified as an expert in crime scene reconstruction and blood stain pattern analysis, as well as in the field of firearms and tool mark examination. He was asked to conduct a crime scene reconstruction of the May 21, 2009 homicide.[8] Three addresses were involved in the crime scene reconstruction: 1304, 1308, and 1312 Lochlomand. Colonel Scanlan explained that because of the extensive amount of the victim’s bloodshed, he was able to follow the path the victim took as he fled from the gunfire in his backyard and finally came to rest at 1312 Lochlomand. Colonel Scanlan explained that a bullet struck the victim in an artery in his leg, which caused arterial spurting. He also explained that running causes the heart to beat faster, which causes more spurting.
Colonel Scanlan testified regarding several items located on the scene, including an assault firearm, a shotgun, a shirt, and a sheet. A make-up bag was found in the wooded area, although not directly next to the guns. He explained that there was no fence behind 1304 Lochlomand, but there was a neighboring fence with a “fence line” that divided 1304 and 1308 Lochlomand. Bullet holes were located within that fence. Argyll Street, he said, was the next street over behind the victim’s house at 1304 Lochlomand, and that 2209 Argyll was the address of the property behind a tree when staring at the victim’s house from Lochlomand. Colonel Scanlan explained that one bullet track produced two holes in the fence because it went through the corner of the fence. He believed that that shot 17originated from between 2209 Argyll and 1304 Lochlomand. He further explained that the blood was not as heavy initially, but by the time the victim hit the fence line, he was bleeding profusely, having suffered gunshot wounds to his arm and leg. No casings or projectiles were recovered from the scene.
Colonel Scanlan testified that the revolver found on the victim was not fully loaded; it contained only three bullets. He also testified that the assault-type rifle and the sawed-off shotgun found on the scene were common guns seen in “crime situations” and both had rounds of ammunition inside of them. He explained that the weapons were rusty and had probably been exposed to the elements from being stored outside. He noted that frequently in crime neighborhoods, guns are stored nearby for quick access because penalties are greater if drugs are sold while holding guns.
Michael Gordon testified that he was familiar with the Scotsdale Subdivision in Harvey, and had previously resided in that area. He admitted that he had prior convictions and said that he was a known drug addict in the neighborhood, but proclaimed that he had been “clean” for three-and-one-half years. He testified that on May 21, 2009, he was residing on Brown Street, which was separated from the Scotsdale Subdivision by a canal and a field. At that time, he had known “Hustle,” whom he identified in court as defendant, for about two-and-one-half to three years. He testified that he regularly saw and spoke with him almost every day and they were “real cool.” He also testified that he knew defendant’s friends, including “Black,” “Red,” “Corey,” and “Teddy.” Mr. Gordon said that he also saw defendant’s friends almost every day.
Mr. Gordon testified that on May 21, 2009, he woke up between 5:15 and 5:30 *707 a.m. when he heard a neighbor outside. He said that he went outside on Brown Street, heard four or five gunshots, noticed a three- to five-second pause, |sand then heard six or seven more gunshots. He then saw some people running down Angus Street. He then noticed a black Grand Prix pull up and saw someone, he knew as “Buck” get into the vehicle. He testified that he had seen “Buck” everyday in the streets of Scotsdale. He testified that he had seen this black Grand Prix every day and knew that the car, which had dark tint and a dent in its front, belonged to “Kenny Boo.”[9]
While he and his neighbor were smoking a cigarette outside, Mr. Gordon observed “Tedrick”/“Teddy,” and “Hustle” running on Brown Street toward them. He saw that “Hustle” had a gun in his hand and as “Hustle” ran past them, “Hustle” said, “What up, Mike?” Mr. Gordon testified that he answered, “What up?” Mr. Gordon said that “Hustle” kept running toward the Expressway. Mr. Gordon testified that the gun he saw in defendant’s hand was a black semiautomatic. Mr. Gordon stated that he did not fear defendant because he was always “all right” with him.
Mr. Gordon further testified that two days after the shooting, he went to 1217 Angus, the house of “Miss Eva” or the “Candy Lady.” He explained that everyone usually hung out in front of her house. According to Mr. Gordon, defendant (“Hustle”), “Corey,” “Red,” and “Black” were there too. Mr. Gordon testified that he overheard “Corey” ask “Hustle” if he got “him” and heard “Hustle” say that he tried to “get him,” but felt he was trying to “draw down,” so he “hit him in the side, and ... shot him in the leg.” Mr. Gordon said “Hustle” stated that when he shot him in the leg, “the Bitch screamed.” Mr. Gordon asked if he had received anything and he said “No.” Mr. Gordon said after he asked this, “Black” made a gesture to “Hustle,” “Corey,” and “Red,” to “shut up,” like 19‘You’re talking too much in front of him.” Mr. Gordon testified that they were referring to the incident as if it had just happened a couple of days before. Mr. Gordon chose not to inform the police about this because he liked “Hustle.”
However, Mr. Gordon went to the Detective Bureau on July 8, 2009 to provide information to the police regarding a matter that concerned “Black.” At this time, the incident with Mr. Ervin “came up.” Later that day, Mr. Gordon was arrested on warrants. He returned to the Detective Bureau and gave a statement regarding Mr. Ervin’s homicide. Mr. Gordon identified “Black” from a photograph the detective showed him, discussed what he had heard and seen on the morning of the shooting, and also discussed the conversation that he had heard at Miss Eva’s.[10]
Mr. Gordon denied that he was promised anything from the Jefferson Parish Sheriff’s Office after he provided it with this information. He testified that he did not give the statement to save himself or for a deal. He admitted that he had vision problems because he had previously been shot in the face, but noted that his eye *708 sight had come back almost perfectly and testified that his eyesight was “good” in May of 2009.
Detective Decker also testified regarding his interview with Mr. Gordon about the case in July 2009. He stated that during the interview, Mr. Gordon identified “Corey” in a photograph. He explained that “Corey” lived at 1217 Angus and his cousins were Ashley and Trina Richardson, whose fingerprints were found on a black makeup bag seized from the victim’s backyard. He explained that Miss Eva Barrage also lived at 1217 Angus, and she was known as the “Candy Lady.” Detective Decker also testified regarding Mr. Gordon’s identification of |10“Black” in a photograph. Detective Decker knew that “Black” was Bryant Gumms and his address was 2209 Argyle.[11] Based on the investigation and the information received from Mr. Gordon, Detective Decker applied for an arrest warrant of defendant. Upon his arrest, defendant provided the following cell phone number: 504-813-8851. He also provided that his nickname was “Hustle.”[12]
Christopher Guient testified that he knew the victim, Mr. Ervin, and that although he no longer lived near him, they still continued their friendship and kept in touch with each other on a regular basis. He described the victim as hard working. He said that he had been to the victim’s house a number of times and never observed him with weapons. He testified about telephone conversations he had had with Mr. Ervin just prior to his death. The first of the two conversations occurred about a week before the murder. The second conversation was two days before Mr. Ervin was killed. He testified that Mr. Ervin told him that he had found at least one weapon in his backyard underneath his back shed. Mr. Ervin had stated to him that he had not put them there, and did not know who did, but he had an “inclination” as to who did. He said that Mr. Ervin seemed concerned and did not know how to deal with the situation, ie., whether he should remove them or get someone else to do it. Mr. Ervin said that he feared that if he left the weapons, more weapons would be stored there. He believed that because of the location where the weapons had been stored, whoever stored them there would know that he would have been the only one to know that the weapons were stored there. As such, he believed that if they were removed, someone would retaliate against him.
In the second conversation, Mr. Ervin said that he had talked to his sibling and some others whom he trusted as to how to deal with the situation in his 11 ,backyard. He told Mr. Guient that he was going to ask a friend who was a police officer to remove the weapons from his premises. Mr. Ervin told him that he believed someone close to his house could observe him and mentioned an apartment complex behind his backyard which had a “clear line of sight.” Mr. Guient believed that Mr. Ervin seemed more scared in this second conversation.
Alex Sider of the New Orleans Police Department testified that he knew the victim, Mr. Ervin, after having attended school with his sister. He described Mr. Ervin as quiet and always working. He testified that Mr. Ervin called him between 6:00 and 7:00 a.m. two days before he was killed. He told him that he had *709 been cutting his grass and found firearms behind the shed in his backyard. He did not know how to move them without getting into trouble. He did not want to call the police and make a “big scene.” He asked him how to remove the weapons from his house. Officer Sider recalled that Mr. Ervin seemed hesitant and scared. Mr. Ervin explained to him that his neighborhood was not the best and there were some people in apartments behind his house who scared him. He did not know how to remove the guns and get them to the authorities without being seen. Mr. Sider offered to go over in uniform and act as if he mistakenly found them. Mr. Er-vin was trying to figure things out and was supposed to call Officer Sider back. Mr. Sider never received a call back from Mr. Ervin, however, and he never made it to Mr. Ervin’s house before he learned that Mr. Ervin had been killed.
Andralla Slayton, the victim’s mother, testified that her son, Mr. Ervin, was living alone in her residence at 1304 Lochlo-mand Drive at the time of his death. She stated that she owned a revolver that was kept at the residence, and recalled that it was loaded with three bullets.[13] Shé explained that her backyard was not enclosed, but there was a neighbor’s fence on one side of her yard. She stated that | [2her backyard was used as a “cut through,” noting that her fence had been removed by unknown people on two occasions because of this.
Ms. Slayton recalled that the last time she talked to her 27-year-old son was on the phone the Sunday before his death. He called her and asked what she would do if she found guns in the yard. She told him that she would call the police. He then admitted to her what he had discovered,[14] but expressed concerns about calling the police. Because she intended to be home that next weekend, she told him that she would handle the situation when she returned, planning to call police at that time. She called him back to see if he was comfortable with waiting, and he said that he was.
Ms. Slayton testified that she was familiar with Crime Stoppers and stated that she gave $2,500 to increase the Crime Stoppers’ reward to $5,000 in connection with a conviction in her son’s death. She testified that the reward funds were never distributed and that the reward would not be paid out because no one reported anything on the death of her son. She further testified that she had never met or spoken to Mr. Gordon.
Ms. Slayton also testified that she received a $60,000 settlement before her son’s death for an injury, yet the funds were not in her possession before her son’s death; rather, the funds were in the possession of her attorney. She said that she had not discussed the receipt of this large sum of money with her neighbors.
Dr. Karen Ross, an expert in forensic pathology, conducted an autopsy of Mr. Ervin. She concluded that Mr. Ervin was the victim of a homicide and his cause of death was a gunshot wound to his right leg and his left arm. She explained that a bullet went through a major artery in his leg and that the shot was 11sfrom at least three feet away. Bleeding was associated with both wounds. Toxicology tests yielded negative results for drugs.
William Herschede, Director of Human Resources at All Star Electric, Inc., testified that Mr. Ervin was employed with his *710 company at the time of his death and had been employed there for almost four months. Mr. Herschede testified that Mr. Ervin was scheduled to work at 6:30 or 7:00 a.m. on May 21st, but never made it in to work that day. He testified that there were no problems with Mr. Ervin during his employment and that “spot drug checks” were done. One such check was done on Mr. Ervin on May 9, 2009 and the results of the check were negative.
Keyonna Conley, defendant’s girlfriend, provided alibi testimony for defendant. She testified that she slept at “Hustle’s” house on May 20, 2009, and arrived around 7:00 or 8:00 p.m. and left about noon or 1:00 p.m. on May 21, 2009. She testified that she was at his house on May 21st at 5:00 a.m. At the time, she was living at 1620 Plaza Drive and defendant was living at 1640 Gary Court with his mother, Mon-trice Henry, and his sister, Terrell Henry. She testified that defendant’s grandmother lived on Lochlomand. She said that her phone number at the time was 504-669-1867. She explained that defendant did not have a working phone at the time, but he used his sister’s phone sometimes, and her number was 504-813-8851. She admitted that she was not really close to his sister and did not text her. She was asked about calls on May 20, 2009 at 11:00 p.m., and at 11:10 p.m., and then on May 21st at 2:30 a.m. She said she was probably using defendant’s sister’s phone and calling her own phone because when she slept over, she would leave her phone with her then 15-year-old sister. She explained that she was 16 years old at that time and was not supposed to be sleeping at defendant’s house. She testified that her mother did not know she was there, so she would leave her phone with her sister to see where her mother was and to make sure she 114was not asking for her. Ms. Conley was questioned about a “pretty long” conversation at 3:00 a.m. on May 21st, and she said she was talking to her sister. She recalled that “Kevin” and “Jamal” slept over on May 20th as well.
Ms. Conley remembered defendant’s sister coming into the room on the morning of May 21st. She testified that defendant’s sister was “banging” on the door to get her school clothes because she and defendant were sleeping in her room. Ms. Conley testified that about ten minutes after defendant’s sister came, defendant’s mother came into the room at 6:00 a.m. and told him about the killing. Defendant’s mother told them someone called and said that a person was killed on Lo-chlomand across the street from defendant’s grandmother’s house.
Ms. Conley testified that she gave a statement to the police on July 21, 2009. When asked why she did not tell them at that time that she was with defendant at the time of the murder, she indicated that she responded only to the questions that the police asked.
Norman Ray Clark III testified as the custodian of records for Sprint/Nextel. He testified about the records that he brought to court for three target telephone numbers, State’s Exhibits 94, 95, and 96. He stated that concerning State’s Exhibit 94, the target number was 504-813-8851 and was subscribed to Terrell Henry. He explained that this was a prepaid phone. He stated that concerning State’s Exhibit 95, the target number was 504-669-1867 and was subscribed to Jonathan Bailey at 1620 Plaza Drive in Marrero. He stated that concerning State’s Exhibit 96, the target number was 504-287-2544 and was subscribed to Montrice Henry. He explained that this was also a prepaid phone.
Mr. Clark testified that calls were made at 3:00 a.m. and at 3:23 a.m. from 813-8851 [defendant’s sister-Terrell Henry’s phone number] to 669-1867 [Miss Conley’s phone *711 number]. He testified that Tower 717 was utilized for both calls, 11sfrom beginning to end. He explained that Tower 717 was located at 51 Fairfield Drive in Gretna.
Mr. Clark testified that at 5:41 a.m. on May 21, 2009, there were three calls in a row for the phone number subscribed to Terrell Henry from a phone number of 504-496-6201. He testified that all three of these calls went to voicemail, so either they were sent to voicemail by a person or rang through and then went to voicemail. He explained that for the voicemails, the beginning tower was Tower 452 (located at 4600 Tenth Street in Marrero) and the ending tower used was Tower 503 (901 Manhattan Boulevard in Harvey). Mr. Clark explained that when the call came in the signal showed the strongest off of Tower 452, but sometime in the process it was sent to voicemail, and the network moved it over and it was connected to Tower 503. He concluded that the person with the phone had to be in the vicinity of both towers. He said that the calls in the 5:40 a.m. range were not hitting off of Tower 717, next to Gary Court, but were hitting off of Towers 452 and 503.[15]
Mr. Clark testified that there was then a call from 669-1867 at 6:34 a.m., and then the phone went silent. Then text messages were sent between 669-1867 and 813-8851.
After the State rested, the defense presented its own witnesses. Keyonna Conley testified again and again explained that she did not tell the police she was with defendant from May 20-21, 2009 because they did not ask her. She also said that although she was with him when he was arrested, she did not know the reason for his arrest. As such, she explained that she did not know this information was important at the time.
| irMs. Conley further testified that defendant was sleeping next to her between 5:30 and 7:00 a.m. on May 21st. She also testified that someone called the house to say someone was shot on defendant’s grandmother’s street, and they thought it could be defendant who was shot. On cross-examination, she admitted that she did not go to school the day after she slept at defendant’s house. She also said that they went to sleep at 1:00 or 2:00 a.m. and woke up when his sister came in at “[f]ive-something, six[.]” She was then asked about the 3:00 a.m. call and said she was probably up at that time and explained that she was probably calling her sister to see about what her mother was doing. She testified that the “813” phone was in her presence or defendant’s presence the entire time and did not leave 1640 Gary Court — Tower 717. She testified that she had no idea who was making other calls from that phone at that time and had no idea why different cell phone towers were picking up the other calls.
Montrice Henry, defendant’s mother, also testified. She said she was living at 1640 Gary Court, Apartment A, at the time of the incident. She acknowledged that her phone number was 504-287-2544. She also testified that her son, whose nickname was “Hustle,” slept at her house in his sister’s bedroom on May 20th, and that Keyonna, Terrell, Jamal, and Kevin (“Boots”) were there as well. She said that there was no reason to think that defendant had left. She said that her sister Kim called at 5:56 a.m. and informed her about the murder, asking where defendant was. She explained that her mother, Miss Althea Henry, lived at 1301 Lochlo- *712 mand Drive near the murder at 1312 Lo-chlomand. She said that her mother’s house was about 15 to 20 minutes from her house. She testified that she knew “Corey” and “Bryant.” She knew that Bryant lived across the street from her mother’s house in apartments on Argyll.
117Cheryl Spears, defendant’s aunt, testified that she heard about the murder on the news and went to her mother’s house to make sure she was okay after she called and there was no answer. She said she called her sister Kim. Ms. Spears lived on Gary Court and believed the trip from Gary Court to Lochlomand, where her mother lived, was about a 15 to 20 minute ride.
Kimberly “Kim” Henry testified that defendant was her nephew, the son of her sister Montrice. She further testified that another sister, Cheryl, called her and told her about the killing around their mother’s house. She explained that she then called Montrice to see if defendant was home.
Defendant’s grandmother, Miss Althea Henry, also testified. She testified that she lived at 1301 Lochlomand in Harvey. She explained that her daughter Cheryl knocked on her door and told her about the murder on May 21 st. She was concerned that the victim was her grandson, whose nickname was “Hustle,” but then learned he had spent the night at his mother’s.[16]
Defendant’s sister, Terrell Stephanie Henry, also testified. She explained that she was living with her mom at 1640 Gary Court, in Apartment A, on May 20-21, 2009. She testified that Keyonna was at their house on the night of May 20th and the morning of the 21st. She said that she woke up and the door was locked to her room, so she knocked on the door about 6:10 a.m. She had to go to school that morning for 7:00 or 7:15 and needed her school clothes from her room. She said she did not talk to Keyonna much.
Kevin Simmons testified that he also spent the night at defendant’s house on May 20th. He agreed that Keyonna, Jamal, defendant, defendant’s mother, and 1 ^defendant’s sister were there. He testified that he had no idea where defendant was when he was sleeping, but believed “Hustle” was upstairs when he slept.
Jamal Jackson testified that he also spent the night at defendant’s mother’s house on May 20th. He agreed that defendant’s girlfriend, sister, and mom were there. He also testified that Kevin was there. He testified that he found out about the killing after he left the house, but knew defendant and Keyonna were at the house when he left. He said he was in the car with defendant’s mother when she got the call as she was bringing defendant’s sister to school.
Defendant also testified. He denied shooting Mr. Ervin for trying to take the guns and further denied any knowledge or ownership of the guns. He also denied talking about the shooting two days later. Defendant, who admitted that his nickname was “Hustle,” testified that on May 20th, he slept at his mother’s house at 1640 Gary Court and slept in his sister’s bedroom that night. He said that he went into the bedroom at 9:00 or 10:00 p.m. and woke up when his sister was knocking on the door for her school clothes the next day at 6:00 a.m. He testified that his girlfriend left at noon or 1:00 p.m. Defendant denied killing Mr. Ervin and denied being in the neighborhood when he was killed. *713 He testified that Mr. Gordon was not telling the truth.
Defendant testified that he knew “Kenny Boo” and “Corey,” but did not know “Red” or “Black.” He admitted that he knew Bryant, but did not know him as “Black.” Defendant said he used his sister’s phone and called Keyonna on May 20th, but that his sister took her phone to school and was texting Keyonna the next day. He admitted to being at his grandmother’s house on Lochlomand during the day on May 20th, but said he went back home that evening.
11flDefendant said Mr. Gordon was a drug addict he knew from the neighborhood and said they were not “cool” with each other at all. He denied seeing Mr. Gordon two days after Mr. Ervin was killed.

ASSIGNMENT OF ERROR NUMBER ONE

Sufficiency of the evidence

In his first assignment of error, defendant argues that the evidence presented at trial was insufficient to support either a second degree murder or a manslaughter verdict.[17] He argues that he was only developed as a suspect in this ease because a convicted felon who was a known drug dealer and addict (Mr. Gordon) gave his name to avoid prosecution for selling counterfeit drugs. He contends that there were other possible suspects in this shooting, including Chad Jones and Shelton Ivory.[18] Further, defendant argues that he presented alibi testimony from several witnesses who attested to the fact that he was at his mother’s house at the time of the shooting and therefore could not be responsible for this crime.
The State responds that in this assigned error, defendant does not contest the elements of manslaughter, but only expresses concern over the credibility of Mr. Gordon. The State notes that the defense was permitted to extensively cross-examine Mr. Gordon regarding his motivations for testifying at trial and the jury heard the arguments regarding Mr. Gordon’s credibility, yet returned a responsive verdict of guilty of manslaughter. It concludes that a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant was guilty of manslaughter.
120The constitutional standard for testing sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55 (quotation omitted), writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d *714 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83 (quotation omitted).
Under La. R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great l^bodily harm, or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. See State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277. In the present case, the State’s theory presented to the jury was specific intent murder.
Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant’s conduct. See State v. Graham, 420 So.2d 1126, 1127 (La.1982); State v. Young, 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 95. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Spears, 05-0964 (La.4/4/06), 929 So.2d 1219, 1224.
In the present case, defendant was charged with second degree murder but was convicted of the responsive verdict of manslaughter. The jury was instructed as to the manslaughter responsive verdict, pursuant to La. R.S. 14:31(A)(1).[19]
"When a defendant does not object to a legislatively established responsive *715 | aaverdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State v. Johnson, 11-336 (La.App. 5 Cir. 2/14/12), 91 So.3d 365, 371. See also State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).[20]
In the present case, defendant did not object to the jury instructions. Further, defendant did not object to the responsive verdict of manslaughter prior to the jury rendering its verdict. Therefore, it is only necessary to consider if the evidence was sufficient to support the offense of second degree murder. See Johnson, 91 So.3d at 371.
However, in the present case, defendant does not argue that the State failed to establish any of the essential statutory elements of his conviction. Therefore, the sufficiency of the evidence with respect to the statutory elements need not be addressed. See State v. Ramirez, 09-350 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 840.
Defendant makes credibility arguments, however, challenging the evidence presented by the testimony of Mr. Gordon, a known drug addict, whom he alleges avoided prosecution in exchange for his testimony. He suggests that Mr. Gordon misidentified him, when other possible suspects, such as Chad Jones and Sheldon Ivory, existed. He also points out that he presented several alibi witnesses to discredit Mr. Gordon’s testimony against him.
It is noted that the jury was instructed as to credibility, including the reasons witnesses have for testifying. The jury was also instructed that the testimony of one witness was sufficient for a conviction, and was also given instructions | ^regarding alibi witnesses.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. White, 472 So.2d 130, 132 (La.App. 5 Cir.1985); State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11), 84 So.3d 611, 617. The credibility of witnesses will not be reweighed on appeal. Miller, supra. “[T]he Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial.” Id. (Quotation omitted.)
In the present case, the jury heard the testimony of Mr. Gordon, including the testimony regarding his prior convictions and his admission as to having a *716 prior drug problem. The jury was also present when the defense rigorously cross-examined him and suggested motivations for his testimony. Nevertheless, the jury apparently found his testimony to be credible and discounted the testimony of defendant’s alibi witnesses. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. See State v. Bailey, 875 So.2d at 955.
Further, defendant challenges Mr. Gordon’s identification of him as the [ ^shooter. Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Ray, 12-684 (La.App. 5 Cir. 4/10/13), 115 So.3d 17, 20, writ denied, 13-1115 (La.10/25/13), 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id. Positive identification by one witness is sufficient to support a conviction. Id.
■ Although Mr. Gordon did not witness the murder, he testified that he heard the shots and then observed defendant running in the area of the shooting with a gun in his hand. He testified that he had known defendant for a few years and had seen him almost every day. He admitted to having vision problems, but testified that his vision was “good” at the time of the shooting. He further testified regarding a conversation he heard a couple of days after the shooting wherein defendant discussed the shooting. Again, the jury apparently believed Mr. Gordon’s testimony. We find that the State sufficiently negated any reasonable probability of mis-identification in order to carry its burden of proof. Although the defense suggested the possibility of another perpetrator at trial (especially in the defense’s opening statement and closing argument), the jury heard the allegations and chose to believe the testimony of Mr. Gordon, whose testimony linked defendant to the killing of Mr. Ervin.
In light of the foregoing, we find that the evidence presented was sufficient under the Jackson standard to support a conviction of second degree murder, and thus, a responsive verdict of manslaughter. See State v. Wright, 10-577 (La.App. 5 Cir. 2/15/11), 61 So.3d 88, 99, writ denied, 11-0560 (La.9/30/11), 71 So.3d 283. This assignment of error is without merit.
| ASSIGNMENT OF ERROR NUMBER TWO

Denial of motion for a new trial

Defendant also argues on appeal that the trial court erred in denying his motion for a new trial based on the premise that the police failed to fully investigate the case by questioning all individuals in the neighborhood who may have seen or heard anything during or after the shooting and therefore overlooked a possible suspect. He contends he was prejudiced by the lack of investigation because Sherida Jackson, a possible eyewitness who allegedly saw another person shoot the victim, was not mentioned in the police reports and she was not presented to the jury, despite the defense’s efforts to locate her and have her subpoenaed to testify in court. Defendant requests that this Court reverse the trial court’s ruling on defendant’s motion for a new trial and remand the matter for a new trial.
The State responds that the trial court did not err in denying defendant’s motion for a new trial.
Defendant’s motion for a new trial was heard on January 18, 2013. At the hearing, Sergeant Corey Wilson and Detective Leon James testified regarding Mr. Gordon’s arrest. They testified that Mr. Gor *717 don was arrested on two attachments.[21] They denied making any deals with Mr. Gordon or promises to him in exchange for information.
Sherida Jackson testified at the hearing that she knew the victim, Mr. Ervin, who lived across the street from her. She was home on the morning that he was found dead. She knew Miss Althea Henry, defendant’s grandmother, who lived two doors down from her. Ms. Jackson denied telling anyone that she knew who was responsible for the shooting. She did not recall speaking to Miss Althea on the |2smorning of the shooting. She admitted that she knew “Shelvin Ivory,” but did not recall speaking to him on the morning of the shooting. She further denied having a conversation with anyone about Mr. Er-vin’s having money in the house. She testified that a deputy did come to her house that morning and asked her if she knew the person who lived across the street. She told the deputy that she knew him and asked what was going on. He then asked if she knew anything “bad” about the victim, to which she replied that she did not. The deputy told her that he could not say too much, but did say that the victim had been shot and was deceased. She denied seeing anyone exit Mr. Ervin’s house that morning before the police arrived and explained that she did not go outside that morning until the police were coming down the street. When asked when she had become aware that her testimony was being solicited for the motion for a new trial, she responded that Miss Althea had come to her house two days earlier.
Defendant’s grandmother, Miss Althea Henry, also testified at the hearing and stated that on the morning of the shooting, Ms. Jackson told her and her daughters, Montriee Henry and Cheryl Spears, that “she had seen everything.” She testified that Ms. Jackson told her that she was on her way to put out her garbage at the time. She said that when her daughter mentioned this to “Sheldon,” Ms. Jackson “got scared” and said she was going to move. She testified that she knew about this discussion in May of 2009 and had told defendant’s attorney about it before trial. She said she had been trying to speak with Ms. Jackson since defendant had been in jail.
Montrice Henry, defendant’s mother, testified at the hearing as well. She testified that she went to her mother’s house on the day that Mr. Ervin was found dead at about 6:00 or 6:45 a.m. and spoke with Ms. Jackson, who lived by her mother. She testified that Ms. Jackson said she saw who “did it” when she was Inputting out the trash around “four-something in the morning.” She said that “Shelvin” joined them and said he saw money by Mr. Ervin’s house, about $64,000 or $65,000, and knew he had money and “didn’t have to go out like a thug, a thief.” She testified that although Ms. Jackson lived one or two houses down from her mother, they were not able to find her to come to court before then.
Defendant’s aunt, Cheryl Spears, also testified at the hearing. She testified that Ms. Jackson seemed scared to talk and refused to discuss it further after “Shel-vin” had come over. She also said that “Shelvin” said the victim was “sitting on” $64,000 and said he had seen the money in Mr. Ervin’s residence. She testified that Ms. Jackson said she had observed “Shel-vin” coming from Mr. Ervin’s house when she was taking out the trash. She said *718 that the conversation was between 7:30 and 8:30 a.m. or “[s]omething like that.”
Sherida Jackson testified again at the hearing, denying that she had seen any shootings. She denied telling anyone she saw anything and denied that she ever said she saw “Shelvin’’ Ivory coming from Mr. Ervin’s house.
At the hearing, the State presented a check from an escrow account of Ms. Slay-ton’s attorney for Ms. Slayton that was dated May 23, 2009, two days after the murder, showing a deposit date of May 27, 2009.
The trial court denied defendant’s motion for a new trial. Defendant objected.
It is noted that defendant’s supplemental motion for a new trial included an argument that new and material evidence was discovered since trial. Defendant argued that Ms. Jackson’s location was unknown at the time of trial and that she would have testified that she saw someone leaving the victim’s home.
Louisiana Code of Criminal Procedure article 851 provides, in pertinent part, that a “motion for a new trial is based on the supposition that injustice has been lasdone the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.” The decision on a motion for a new trial rests within the sound discretion of the trial judge and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Drewery, 12-236 (La.App. 5 Cir. 1/30/13), 108 So.3d 1246, 1252.
Louisiana Code of Criminal Procedure article 851(3) provides, in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
* ⅜ *
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty[.]
Louisiana Code of Criminal Procedure article 854 lists the necessary allegations for supporting a new trial motion based on newly discovered evidence. State v. Richoux, 11-1112 (La.App. 5 Cir. 9/11/12), 101 So.3d 483, 489, writ denied, 12-2215 (La.4/1/13), 110 So.3d 139. Furthermore, the jurisprudence also imposes four requirements on this motion: 1) the evidence must have been discovered since the trial; 2) failure to learn of the evidence at the time of trial must not be due to defendant’s lack of diligence; 3) it must be material to the issues at the trial; and 4) it must be of such a nature that it would probably produce an acquittal in the event of a retrial. Richoux, 101 So.3d at 489. The trial court’s application of these precepts to newly discovered evidence is entitled to great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. State v. Do, 13-290 (La.App. 5 Cir. 11/19/13), 130 So.3d 377, 388.
|2aIn the evaluation of whether the newly discovered evidence warrants a new trial, the test employed is not simply whether another jury might return a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. Id. at 9, 130 So.3d 377 (citing State v. Molinario, 400 So.2d 596 (La.1981)). Further, an application for a new trial on the ground of newly discovered evidence should be viewed with extreme caution. State v. Richoux, 101 So.3d at *719 489 (citing State v. Jefferson, 305 So.2d 465, 468 (La.1974)).
Upon review, we find that the record does not support defendant’s argument that “Shelvin’’ Ivory was developed as a suspect. Although defendant argues that Sherida Jackson was an eyewitness to the shooting who allegedly saw someone other than defendant shoot the victim, Ms. Jackson specifically denied that she witnessed the shooting at the hearing on the motion for a new trial. In fact, Ms. Jackson denied going outside until the police were coming down the street. Finally, defendant argues that the police failed to fully investigate the matter when it failed to question Ms. Jackson. However, Ms. Jackson testified at the hearing on the motion for a new trial that she was questioned by a deputy on the morning of the shooting.
Defendant has not met all of the statutory and jurisprudential requirements necessary to support a successful motion for a new trial based on this allegedly newly discovered evidence. The testimony of defendant’s relatives suggests that they knew about what Ms. Jackson had allegedly said to them regarding her observations on the morning of the shooting. The relatives claimed that they tried to talk to Ms. Jackson, but she was not available until just prior to the hearing on the motion for new a trial. It is noted, however, that Ms. Jackson lived near defendant’s grandmother, apparently only two houses down from her. Ms. Jackson | ^denied being an eyewitness to the shooting and denied having the conversations that defendant’s relatives alleged that she had with them. Even if defendant were to be given a new trial, it seems unlikely that Ms. Jackson would testify any differently from how she testified at the hearing. Hence, there is no newly discovered evidence that would produce a verdict different from that rendered at trial.
Accordingly, the trial court did not abuse its discretion in denying defendant’s motion for a new trial based on this argument. This assignment of error is also without merit.
ERRORS PATENT REVIEW The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following errors patent require correction.

Discrepancies in habitual bill commitment and Uniform Commitment Orders

First, discrepancies are noted in the habitual bill commitment. The habitual bill commitment reflects that defendant was convicted of manslaughter on January 18, 2013. However, defendant was actually convicted on November 10, 2012, and was sentenced on January 18, 2013. Also, the habitual bill commitment reflects that the habitual bill was filed on February 8, 2013. The habitual bill itself only reflects in the handwritten notation that it was filed in February of 2013. However, it is stamped as filed on February 6, 2013. For purposes of accuracy, we find that corrections are required, and thus remand the matter to the trial court for said corrections to the habitual bill commitment.
Further, the evidence presented at trial established that the date of this offense was May 21, 2009. However, the record includes a Uniform Commitment |SiOrder regarding the original sentence and a Uniform Commitment Order regarding the enhanced sentence, both of which reflect that the date of the offense was July 21, 2009. Also, the Uniform Commitment Order for the original sentence reflects that the “adjudication date” was January 18, *720 2013, when defendant was actually convicted on November 10, 2012.[22] This Court has previously remanded a matter for correction of the Uniform Commitment Order after noting a discrepancy. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142.
The district court is further ordered to make the entries reflecting these corrections and direct the Clerk of Court to transmit the originals to the officer in charge of the institution to which the defendant has been sentenced, and to the Legal Department of the Department of Corrections. See La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).

Prematurely filed motion for appeal

Next, it appears that defendant’s motion for appeal was prematurely filed, as it was filed after defendant was originally sentenced, but prior to his adjudication as a habitual offender. However, any prematurity of defendant’s appeal was cured by the subsequent resentencing of defendant as a habitual offender. See State v. Horton, 09-250 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 373 n. 1; State v. Davis, 07-544 (La.App. 5 Cir. 12/27/07), 975 So.2d 60, 63 n. 1, writ denied, 08-0380 (La.9/19/08), 992 So.2d 952. See also State v. Pollard, 12-346 (La.App. 5 Cir. 12/18/12), 106 So.3d 1194, 1197 n. 2, writ denied, 13-0140 (La.6/21/13), 118 So.3d 408 (where this Court noted that the defendant’s motion for appeal was premature, having been filed after sentencing on the underlying charge, but before consideration of the habitual bill of information; however, this procedural defect | ;awas cured by the trial court’s imposition of sentence on the habitual bill). Accordingly, no corrective action is necessary on this issue.

Incomplete advisal as to prescriptive period for post-conviction relief

Additionally, defendant received an incomplete advisal as to the prescriptive period for post-conviction relief pursuant to La.C.Cr.P. art. 930.8. The commitment for the original sentence and the habitual offender bill commitment reflect that defendant received a proper advisal of the prescriptive period for filing post-conviction relief in accordance with La.C.Cr.P. art. 930.8. However, the transcript for the original sentencing does not reflect an ad-visal. The habitual offender bill transcript reflects an incomplete advisal: “two years from the date your sentence becomes final to file post-conviction relief applications.” The transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). Finally, the waiver of rights form regarding the habitual offender bill does not contain an advisal.
Accordingly, we advise defendant, by way of this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.

CONCLUSION

Accordingly, for the reasons assigned, defendant’s conviction and sentence are hereby affirmed. The matter is remanded *721 to the trial court for correction of the commitments as noted herein.

AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENTS.

. See errors patent discussion, infra, regarding the premature nature of defendant's appeal.

. It is noted that the habitual offender bill of information reflects that defendant's underlying manslaughter conviction was on November 12, 2010, when in fact the underlying manslaughter conviction was on November 10, 2012.

. Ms. Slayton testified that the house her son, Mr. Ervin, was living in was hers, and drat he lived there because she had moved out of state after Hurricane Katrina hit the New Orleans area.

.Nancy Webber of the Jefferson Parish Sheriff's Office 9-1-1 Center testified that a 9-1-1 call was placed by Gretchen Moten on May 21, 2009 at 5:26 a.m. from 1312 Lochlomand Drive in Harvey. She testified that officers were sent to the location, and Officer Nicholas Davidson arrived at 5:33 a.m.

. Mrs. Moten testified that she would not have suspected Mr. Ervin to be walking around wearing a mask and armed with a loaded gun.

. The AK47 and shotgun were introduced as exhibits at trial.

.Detective Decker testified that there was a hole in a wall of the residence caused by the Jefferson Parish Sheriff's Office. He explained that the door was locked when the home was "secured,” and then when the officers returned with a search warrant, they had to force the door open. The force used to open the door caused the door knob to hit and damage the wall.

. The State introduced photographs of the scene provided by Colonel Scanlan at trial.

. Sergeant Charles Arnold testified that on June 18, 2009, he stopped a black Pontiac G-6 and gave a ticket to Kentaz Gayden. His address was 1249 Angus in Harvey. Detective Kevin Decker of the Jefferson Parish Sheriff's Office testified that he had talked to Mr. Gayden numerous times and knew that he went by the nickname "Kenny Boo.”

. Mr. Gordon admitted that he previously had said Mr. Ervin was shot because of money and cocaine, but explained that he just added cocaine, not saying that Mr. Ervin had cocaine, but because cocaine could be bought with money.

. Colonel Scanlan testified that he believed from the angle of the bullet holes in the fence, the gunshot had originated from between 2209 Argyll and die victim’s address.

. Detective Decker testified that defendant had a tattoo on his right arm that reflected "Harvey Hustler” and another on his shoulders that said "Hustle.”

. Ms. Slayton identified her revolver in a photograph shown to her. Another photograph showed three bullets in the revolver.

. Ms. Slayton indicated that she was only aware of one gun.

. It is noted that the question implied that the two towers were located in the vicinity of Lochlomand Drive.

. Michael Haggerty, lead analyst for AT & T Asset Protection and custodian of records, appeared at trial based on a subpoena involving records for phone number 504-363-9183, for subscriber Miss Althea Henry at the address of 1301 Lochlomand Drive in Harvey.

. The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Hooker, 05-251 (La.App. 5 Cir. 1/17/06), 921 So.2d 1066, 1074. In the present case, defendant did not file a motion for post-verdict judgment of acquittal. Nonetheless, the failure to file a post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. See State v. Washington, 421 So.2d 887, 889 (La.1982); State v. Robinson, 04-964 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1120 n. 3.

. Mr. Ivory’s first name is spelled different ways in the record.

. La. R.S. 14:31(A)(1) provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation ■ shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed[.]

. The Blackburn court explained: "It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object." Blackburn, 424 So.2d at 251-52.

. Apparently, Mr. Gordon was observed in what appeared to be a drug transaction and discarded an object upon the sight of the police. However, the substance was tested and yielded negative results. As such, he was only arrested on the attachments.

. It is noted that defendant's original sentence was vacated when the trial court resen-tenced defendant as a habitual offender.