STATE OF LOUISIANA

VERSUS

MALIK B. MCGINNIS AKA "RK"

NO. 23-KA-472

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-7463, DIVISION "F"
HONORABLE MICHAEL P. MENTZ, JUDGE PRESIDING


July 31, 2024


**AMANDA L. CALOGERO**
**JUDGE**


Panel composed of Judges Stephen J. Windhorst,
John J. Molaison, Jr., and Amanda L. Calogero, Pro Tempore


**AFFIRMED; REMANDED WITH INSTRUCTIONS**
    **ALC**
    **SJW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Andrea F. Long
     Douglas E. Rushton, Jr.

COUNSEL FOR DEFENDANT/APPELLANT,
MALIK B. MCGINNIS AKA "RK"
     Prentice L. White

**CALOGERO, PRO TEMPORE, J.**

Defendant, Malik B. McGinnis, seeks review of his convictions for two counts of attempted first degree murder (counts three and four), one count of obstruction of justice (count five), and two counts of first degree murder (counts eight and nine). For the following reasons, we affirm his convictions and sentences.

## PROCEDURAL HISTORY

On December 19, 2019, a Jefferson Parish Grand Jury returned a bill of indictment in case number 19-7463 charging defendant, Malik B. McGinnis a/k/a R.K., with two counts of attempted first degree murder in violation of La. R.S. 14:27 and La. R.S. 14:30 (counts three and four), and obstruction of justice for removing the .38 caliber revolver from the crime scene and/or getting rid of the jacket[1] he wore during the offenses in violation of La. R.S. 14:130 (count five).[2] Defendant was arraigned and pled not guilty. On motion by the defense, case number 19-7463 was joined with case number 19-5258, wherein defendant was charged with two counts of first degree murder in violation of La. R.S. 14:30 (now counts eight and nine).

Defendant proceeded alone to trial on two counts of attempted first degree murder, one count of obstruction of justice, and two counts of first degree murder. The jury found him guilty as charged on all counts.

As to counts three and four (attempted first degree murder), the court sentenced defendant to fifty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on each count. As to count five (obstruction of justice), the court sentenced defendant to forty years imprisonment

---

[1] While the indictment references a jacket, this article of clothing is referred to as a hoodie, sweatshirt, and shirt. Despite the various phraseology, the terms refer to the same item.

[2] In the same indictment, Everette Campbell a/k/a K.R., was charged with two counts of second degree murder in violation of La. R.S. 14:30.1 (counts one and two), one count of obstruction of justice in violation of La. R.S. 14:130.1 (count six), and one count of cultivation of marijuana in violation of La. R.S. 40:966(A) (count seven).

at hard labor. As to counts eight and nine (first degree murder), the court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on each count. The court ordered the sentences to run concurrent with each other. On May 24, 2023, defendant filed an application for post-conviction relief for an out-of-time-appeal, which the trial court granted.

## FACTS

This case involves a double homicide and an attempted double homicide in Marrero, Louisiana. On the night of September 4, 2019, at 3044 Sorbonne Drive, the following individuals were living at and present at the house: Ronald Eddington (then twenty-two years old), Ronald's girlfriend Gisselle Barrientos, Ronald and Gisselle's two-year-old baby Gloria, Ronald's sisters M.S. (then seven years old) and J.E.[3] (then eleven years old), Ronald's brother Rondall Eddington, Rondall's girlfriend Dajah Green, and Juwan Magee (then twenty years old), who was a family friend. M., the mother of Ronald, Rondall, M.S., and J.E., lived in the house but was at work that night. Defendant Malik McGinnis (also identified as R.K.) and Everette Campbell (also identified as K.R.) went to the home that evening. Gisselle and Juwan described defendant as Ronald's friend, and Gisselle also knew him from high school. Defendant previously stayed at the house but had not stayed there for several days. Ultimately, Ronald, M.S., Juwan, and J.E. were shot. Ronald and M.S. died from their wounds.

---

[3] In the interest of protecting minor crime victims as set forth in La. R.S. 46:1844(W)(3), this Court's policy is that published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (*i.e.*, parent, sibling, or relative with the same last name as the victim). *State v. E.J.M., III*, 12-774, 12-732 (La. App. 5 Cir. 5/23/13), 119 So.3d 648, 652. *See also* Uniform Rules of Louisiana Courts of Appeal, Rule 5-2. J.E. was a minor at the time of the offense and does not share a last name with any other witnesses.

La. R.S. 46:1844(W)(1)(a) provides in pertinent part, "The public disclosure of the name of the juvenile crime victim by any public official or officer or public agency is not prohibited by this Subsection when the crime resulted in the death of the victim." One victim, M.S., in count nine was a minor at the time of her death. Because the indictment and the briefs to this Court use the minor's initials, this Court's opinion will also use the minor's initials. *See State v. Lachney*, 23-78 (La. App. 5 Cir. 10/31/23), 374 So.3d 1027, 1028 n.1. M.S. shares a last name with her mother, who will be identified by first initial only because she and M.S. have the same initials.

That night, Juwan had just finished showering, and Gisselle was in the bathroom. Rondall and Dajah were in their bedroom when defendant and his friend Campbell arrived at the house. Juwan answered their knock. J.E., who was in the living room, saw defendant and Campbell enter the house. Defendant asked Juwan if Ronald was home and stated he was trying to smoke. Testimony at trial established that Ronald occasionally sold marijuana to his friends. Juwan escorted them to Ronald's room before returning to the living room. J.E. went to her and M.S.'s bedroom. Gisselle brought Gloria into the bedroom with Ronald, defendant, and Campbell, and Juwan rejoined them. The group sat around and smoked. Gisselle stated that after approximately ten to thirty minutes, defendant and Campbell left the house, went to a gas station, and then returned to the house and the bedroom.

Gisselle and Juwan both stated that something did not feel right that night. Gisselle testified that she felt bad energy from defendant and Campbell from the beginning of the night. She explained that defendant never sat down and that his body language appeared "off." Juwan said that defendant was pacing and looking around. He stated that he knew that defendant had a gun that evening because he kept touching his pants. Juwan stated no one else had a gun that night. Defendant's behavior made Juwan think something was going to "go down." Gisselle texted Juwan about the bad energy she felt, and he replied that he also felt it. Juwan stated they showed Ronald their texts but that he was not receptive. Gisselle then texted M. about her bad feeling. After M. texted Ronald, defendant and Campbell were told to leave. Defendant and Campbell "dapped" the others, and defendant gave Gisselle a hug. Ronald walked defendant and Campbell to the front door while Juwan, Gisselle, and Gloria stayed in the bedroom.

Rondall explained that from his bedroom, he heard Ronald tell defendant by name to get out of the room. He stated that they left through the front door, and

the door was locked. Rondall next heard knocking, Ronald opening the door, and then gunshots. Juwan and Gisselle were still in the bedroom when they heard a sound and exchanged a look. They heard it again and realized it was gunshots. J.E. similarly recalled hearing a sound she later learned was a gunshot. Gisselle and Gloria were still in the bed when Gisselle and Juwan saw defendant appear in the bedroom doorway and aim a black revolver at Gisselle and Gloria. As Gisselle yelled and shielded her daughter, Juwan, who was behind the door, tried to make the gun fall out of defendant's hand by hitting the door on his hand. Juwan explained that defendant pointed the gun towards the back of the door and tried to shoot him but could not. Juwan continued to try to slam the door on defendant's hand. Defendant kicked down the door, and it fell on Juwan. Defendant came in the room and put the gun to Juwan's face. Juwan heard the gun make a "click" noise twice as defendant tried to shoot him. Juwan pushed defendant into the hallway towards M.S. and J.E.'s room, and they fought. Gisselle called the police. Rondall heard the fighting, and he and Dajah left their bedroom via a window.

J.E. recalled that at some point, she and M.S. ran out of their room. J.E. ran back in their room, but M.S. was no longer with her. As J.E. was on her bed, defendant stood by her door, shot her in her left arm, and left the room. J.E. recalled that defendant wore all black and indicated that even though it was dark, she knew it was him because of his dreadlocks.

Juwan testified that defendant shot him in the stomach while they were fighting in the hallway, but he did not realize it at the time. Juwan pushed defendant through M.'s door, breaking it. Juwan "picked him up and walked him outside" through the hallway. As Juwan got him out of the house, he saw M.S. and Ronald on the floor. Juwan walked back into the bedroom, and he and Gisselle saw that he was bleeding.

From his position in the back yard, Rondall saw an unidentifiable person

wearing a black jacket pass by. Several seconds later, he saw another person jog by wearing a gray jacket, whom he identified as defendant based on his dreadlocks. Dajah stated she saw defendant, whom she also identified by his build and dreadlocks, in a black hoodie and black pants running away. Rondall and Dajah then re-entered the house through the window. Rondall opened his bedroom door and saw Juwan, who told him that defendant shot him.

Rondall proceeded into the hallway where M.S. was lying on the bloody floor near the bathroom. Someone checked on J.E. in her bedroom. Rondall walked into the living room where he saw Ronald on the ground. Rondall acknowledged talking to a 9-1-1 operator after he saw his siblings on the ground. Rondall acknowledged that at some point, he moved Ronald's marijuana from Ronald's bedroom to his own closet because he did not want it to be found.

Deputy Kyle Miller with the Jefferson Parish Sheriff's Office (JPSO) arrived at 3044 Sorbonne Drive that night at the same time as Deputy Kyle Nugent. Deputy Miller heard someone jump over a chain-link fence. Deputies Miller and Nugent knocked on the front door, and two adult women answered it. The deputies saw M.S. lying in a pool of blood, and Deputy Nugent proceeded towards her. Deputy Miller then saw Ronald lying on the floor next to a couch. Deputy Miller spoke to J.E., who had a gunshot wound to her left arm. She relayed to him that the person who shot her had once lived with them. The deputies also spoke to Juwan, whom they located in the back bedroom suffering from a gunshot wound to the stomach, and Rondall.

JPSO Detective Jean Lincoln also went to 3044 Sorbonne that night. While at the scene, Detective Lincoln spoke to M., who had arrived home and relayed information she was told about defendant. Defendant was identified as a suspect.

Sergeant Jene Rauch with the JPSO crime laboratory went to 3044 Sorbonne Drive with other members of the crime lab. No fired casings or firearms were

found on the scene. Without a gun for comparison, Sergeant Rauch could not associate projectiles and casings with a particular gun.

Overall, four projectiles were recovered from the incident. Sergeant Rauch later concluded that the three copper jacketed projectiles (one recovered from M.S.'s clothing, one found under Ronald's body, and one removed from Juwan's body) were fired from the same .38 caliber class weapon, which she believed was a revolver-type firearm because no casings were recovered at the scene and a revolver must be manually unloaded. She further said it could have specifically been a Smith and Wesson revolver. Sergeant Rauch testified that the projectiles found in the home were inconsistent with a .22 caliber firearm. Sergeant Rauch testified that in J.E. and M.S.'s bedroom, the wall above the bed had damage consistent with a gunshot hole caused by a projectile that had already hit something else, such as J.E.'s arm. A silver projectile was found in the room adjacent to J.E. and M.S.'s room. Sergeant Rauch testified that it was consistent with a lead core and that she could not determine from what it was fired. Additionally, a red projectile filler was located between M.S.'s body and the door to the bathroom. The filler was consistent with a "flex tip" used in hollow point projectiles.

Detective William Roniger initially went to the residence and was immediately informed that defendant was a suspect. Detective Roniger proceeded to his office to research defendant and to compile a six-person photographic lineup.

Juwan and J.E. were taken to the hospital. JPSO Detective Jesus Falcon rode to the hospital with J.E. She told Detective Falcon that defendant shot them, and he relayed that information to other detectives. While at the hospital, Detective Falcon showed J.E. a photographic lineup, and she identified defendant as the person who shot her.

Gisselle, Rondall, and Dajah were placed in separate police cars and were later interviewed at the detective bureau. Detective Lincoln relocated to the bureau.

Gisselle identified defendant and Campbell in photographic lineups. She also identified Campbell by his rap artist name and showed Detective Lincoln his rap video. Detective Lincoln then located additional videos, some of which included defendant. Rondall and Dajah identified defendant in photographic lineups as the person they saw running from the house that night. Detective Lincoln obtained an arrest warrant for defendant.

Surveillance videos from 3033 Lillie and 3037 Sorbonne (across from the scene of the shooting) were obtained. Detective Lincoln explained that the footage from 3033 Lillie showed two subjects running. Upon viewing the video from 3037 Sorbonne, Detective Lincoln identified defendant and Campbell walking on the sidewalk. Based on that video, Deputy Miller identified the suspect's vehicle as a Kia Soul. Detective Lincoln described that the video shows a brief exchange consistent with a drug transaction. It then shows the Kia turn around and Ronald go back inside the house. The video shows defendant walk inside while Campbell remained outside. Detective Lincoln narrated that defendant introduced Campbell to Ronald and that the three of them went inside. Approximately a minute later, defendant and Campbell exited the house and walked away. Approximately five minutes later, defendant and Campbell returned to the house and were let back inside where they remained for twenty to twenty-five minutes. Detective Lincoln testified that Campbell then exited the house and that before the front door closed behind defendant, he returned inside, and Campbell followed him. Surveillance then shows Campbell run out and then defendant, who is then limping, run out. Video shows defendant get in the rear passenger door of the Kia that first dropped him and Campbell off, and the vehicle drives away. Defendant and Campbell return outside the house. Defendant ran across the front yard of the house, and Campbell jumped a side fence. Detective Lincoln testified that video did not show anyone else go in or out of the house before the police arrived. She was unable to

identify the driver of the Kia.

While conducting research on the case, Detectives Lincoln and Roniger learned that the Kia Soul was involved in a traffic stop conducted by Officer Hank Rogers on August 31, 2019, just a few days before the shooting. During that incident, Campbell was driving the car with an unreadable temporary license plate. Defendant was a backseat passenger, and there were also two women in the car. Officer Rogers detected the odor of marijuana coming from defendant when he exited the vehicle. A small bag containing vegetable matter from defendant's back pocket field-tested positive as marijuana. Two gun—a 9 mm Glock pistol that Campbell claimed ownership of and a Smith and Wesson .38 revolver that defendant claimed ownership of—were found in the vehicle. Neither gun was stolen, nor did defendant or Campbell have prior felony convictions. As such, the guns were returned to their owners.

Detective Roniger identified Campbell as the second suspect in the shooting, and he created a photographic lineup that included Campbell. Detective Lincoln explained that deputies went to Campbell's last known address, and the Kia with the temporary license plate was parked outside. Detective Roniger shined his flashlight into the car to verify the temporary license plate. In doing so, he saw a magazine for a Glock handgun in the center console and several fired cartridge casings in the back seat. Officers surveilled the vehicle and saw Campbell approach it. Campbell got in the rear seat of the Kia. Detective Roniger arrested Campbell.

Campbell's apartment was searched. An empty Glock gun box containing .38 caliber bullets (some with a red filler tip) and a Glock magazine were found in the apartment. A marijuana grow tent, marijuana plants, a recording studio, and a rifle were also found inside. No rifle rounds from that weapon were found at the scene of the shooting.

The Kia Soul was searched by Sergeant Thomas Gai, previously with the JPSO, on September 5, 2019. A Glock 9 mm magazine containing five live pointed semiautomatic rounds was found in the center console of the vehicle. Four fired .38 special caliber casings were found in the back seat and five unfired .38 special cartridges, some of which had a red filler tip, were located in the front cup holder. Sergeant Rauch determined that the four fired cartridge casings found in the Kia were fired from the same .38 special weapon. The red filler found in the house was from the same brand and caliber as some of the fired and unfired cartridges found in the Kia. A pair of men's pants were also found in the back seat. Campbell's fingerprints were found on the interior driver door handle of the Kia. Additionally, Sitara Shirwani, DNA analyst at the JPSO DNA lab, found moderate support that Campbell was a contributor to the DNA on the interior rear passenger door handle of the Kia.

During the afternoon of September 5, 2019, defendant arrived at the investigations bureau and interacted with Sergeant Gai. Defendant was arrested,[4] advised of his *Miranda*[5] rights, and agreed to provide Detective Roniger a recorded statement. Defendant acknowledged that he was in the Kia Soul when it was stopped days prior to the shooting, but he denied that the firearm he claimed ownership of at that time actually belonged to him. Defendant acknowledged that he and Campbell were present at 3044 Sorbonne the night of the shooting, and he identified Campbell in a photographic lineup. Defendant told the officers that during the shooting, he wore the same clothes he was wearing during the interview. He clarified that he changed his shirt because the other one was wet. Defendant told the officers that the other shirt was at home, but he did not know the address. His statement conflicted with the surveillance videos and the evidence. Defendant

---

[4] Juwan later told the detectives that the two arrested individuals were the people responsible for the shootings at Sorbonne that night.
[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

told the officers that Campbell had left alone before two men came to the house to buy marijuana. He stated those men went inside and that one of them shot everyone. Defendant said he ran to the back of the house to protect himself and that he did not have a gun that night.

Defendant's clothes were collected because he stated he was wearing the same clothes from the night of the shooting except for his jacket, and there appeared to be blood on the clothes. Ms. Shirwani performed forensic DNA analysis on a pair of black pants belonging to defendant, a pair of underwear, and a black shirt. She also analyzed a pair of jeans. There was very strong support that Campbell was a contributor to the DNA from the blood on the jeans. Juwan could not be excluded as a major contributor to the blood found on the black pants and the underwear or as the sole contributor to the blood on the shirt.

Dr. Yen Van Vo conducted autopsies of Ronald and M.S. She recovered a projectile from M.S.'s shirt. She concluded that Ronald's cause of death was a gunshot wound to the back of his head. She described his death as instantaneous. A toxicology report for Ronald showed marijuana and tobacco in his system. Dr. Vo determined that M.S. died from a gunshot wound to the right side of her upper chest. Dr. Vo testified that based on the trajectory of the bullet and sustained injuries, M.S. would have lived a few minutes after sustaining the injury.

Defendant testified at trial that Ronald was a close friend of his whom he lived with for approximately a month. He said Ronald sold marijuana to his friends. He stated that Campbell was a longtime friend of his. Defendant explained that the night he and Campbell were pulled over in the Kia, officers found marijuana on him and two guns in the car. He stated that even though he did not know anything about the guns, he eventually falsely claimed ownership of the revolver because he did not want Campbell to be in trouble. He provided that the officers got in a patrol car with the guns and that he never saw the guns again.

Defendant stated that on the night of the shootings, he called Campbell to drive him to Ronald's house to buy marijuana. When he was picked up, an unidentified person was driving Campbell's car, another unidentified person was in the passenger seat, and Campbell was in the back seat. They parked on the corner of Ronald's street. He identified himself and Campbell on surveillance video ringing the doorbell. He entered while Campbell stayed outside. Defendant testified that he wanted to buy marijuana from Ronald, but Ronald could not produce change for the money defendant had with him. He stated that he was going to get change and left out of the front door. Ronald and Campbell shook hands and then Ronald told them to step inside. They all went inside, and defendant and Campbell then went back to Campbell's car to get change from one of the car's occupants. Defendant stated he and Campbell returned to the house and went with Ronald to his bedroom where Gisselle and the baby were.

Defendant stated they talked and listened to music, and he bought marijuana. He went to the living room and invited Juwan to smoke with them. He recalled that they smoked and described himself as "stoned." Defendant said they ultimately decided to leave because the baby was crying. Campbell left the bedroom first, followed by Ronald, and then defendant. As they approached the living room, Ronald got in front. Defendant was looking at his phone as Ronald and Campbell talked. Defendant testified that he heard a gunshot. He saw a gun in Campbell's hand and Ronald on the floor. Defendant ran down the hall and tried to get in Ronald's bedroom, but Juwan kept closing the door on him. He told Juwan that someone was shooting and to let him in the room. Juwan and defendant fought over the door until it fell in. Defendant denied having a gun or pointing a gun at Gisselle or Juwan.

Defendant provided that he and Juwan then wrestled in the hall as Campbell walked down the hallway. He recalled that Juwan put him in a chokehold and that

they fell through M.'s bedroom door. Defendant provided that Juwan wrestled the phone out of his hands because he thought it was a gun. When Juwan saw it was a phone, he pushed defendant to the front door and told him not to return. Defendant testified that while he and Juwan wrestled, he heard two or three more gunshots. He saw M.S. on the ground.

Defendant stated that Campbell left the house first and then he left. Defendant indicated that he went back inside to check on M.S. and Ronald and that Campbell followed him in. Campbell then ran back to the Kia, and defendant ran to the car after him. Defendant said he later jumped out the car at a stop sign. While viewing the surveillance video, he denied that he went back to the house or jumped a fence that night and indicated that unlike the person in the video, he wore a hoodie that night. Defendant acknowledged that the night of the shooting, he wore dark pants and had dreadlocks. However, he stated that the front passenger of the Kia also wore dark pants and had dreadlocks. He suggested that the person shown in the video returning to the house the final time was that passenger. He stated the only person shooting that night was Campbell and that he did not know why Campbell did it.

Defendant explained that he went home and smoked. His mother told him that he was on the news and that he had to turn himself in. He testified that when he got home, he took off his jacket because he was hot, and it was wet with his sweat. Otherwise, he did not change his clothes. Defendant stated that when he took off his sweatshirt at home, it likely had blood on it that transferred to his shirt. He explained that he did not know that there was any blood on his clothes. He further denied that he took off his sweatshirt so that he would not have blood on him when he spoke to the police. His mother later took him to the police station, and he spoke with detectives, who took his clothes. He admitted that at the time, he lied about some things.

**DISCUSSION**

Defendant argues that the State failed to prove beyond a reasonable doubt that he was the shooter. He avers that the evidence showed that the witnesses' testimony was not credible as multiple witnesses testified to smoking marijuana before the shooting. He contends that the jury's guilty verdict was based on him bringing Campbell to the house to purchase marijuana and that the witnesses identified him as the shooter because they were familiar with him. Defendant also asserts that the witnesses collaborated together against him because he was responsible for bringing an armed stranger to their home.

As to his conviction for obstruction of justice, defendant argues that the State failed to prove beyond a reasonable doubt that he had specific intent to tamper, alter, or destroy evidence in the police investigation. He contends that the removal of his hoodie before going to the police was not proof of the required specific intent to obstruct, delay, or hinder the police investigation into the incident. Defendant avers that considering the local weather patterns in early September, he was likely hot, sweaty, and uncomfortable wearing a dark-colored hoodie at the time. Defendant concludes that all of his convictions should be reversed.

The State avers that there was no reasonable probability that defendant was misidentified. The State contends that multiple witnesses identified him in photographic lineups as being present at the house and the person who shot at least two of the victims. It argues that forensic firearm and DNA evidence supported defendant's convictions. The State contends that even assuming that defendant had not been the actual gunman, the evidence would still be sufficient to support his convictions based upon the law of principals.

As to defendant's argument regarding obstruction of justice, the State responds that it presented sufficient evidence. It argues that based on defendant's

recorded statement and testimony at trial, any rational trier of fact could have reasonably concluded that he removed his hoodie to avoid being identified as the perpetrator.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Nguyen*, 22-286 (La. App. 5 Cir. 2/27/23), 359 So.3d 108, 118; *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 816, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2. Here, defendant did not file such a motion; however, the failure to file a motion for post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. *See State v. Mejia*, 23-161 (La. App. 5 Cir. 11/29/23), 377 So.3d 860, 874, *writ denied*, 23-1722 (La. 5/29/24), 2024 WL 2745796.

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Johnson*, 23-273 (La. App. 5 Cir. 2/28/24), 382 So.3d 1129, 1133. The directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Johnson*, 23-309 (La. App. 5 Cir. 12/27/23), 379 So.3d 771, 775. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not

require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id*.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Stephney*, 19-77 (La. App. 5 Cir. 2/28/24), 382 So.3d 1091, 1107. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id*. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *State v. Chester*, 19-363 (La. App. 5 Cir. 2/3/21), 314 So.3d 914, 941, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Davis*, 22-281 (La. App. 5 Cir. 3/8/23), 360 So.3d 82, 89, *writ denied*, 23-507 (La. 1/10/24), 376 So.3d 133. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. *State v. Lloyd*, 21-645 (La. App. 5 Cir. 8/24/22), 348 So.3d 222, 231, *writ denied*, 22-1354 (La. 11/22/22), 350 So.3d 499.

***Convictions for Attempted First Degree Murder (counts three and four) and First Degree Murder (counts eight and nine)***

Defendant was convicted of two counts of first degree murder in violation of La. R.S. 14:30, which provides that first degree murder is the killing of a human being:[6]

> (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of … armed robbery…
> 
>         \*\*\*
> 
> (3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
> 
>         \*\*\*
> 
> (5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve …
> 
> (6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law.

Defendant was also convicted of two counts of attempted first degree murder in violation of La. R.S. 14:27 and La. R.S. 14:30. La. R.S. 14:27(A) provides:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Defendant does not contest on appeal that the State failed to prove any specified essential statutory element of La. R.S. 14:30 or La. R.S. 14:27. Rather, defendant argues that the State failed to prove beyond a reasonable doubt that he was the shooter and questions the witnesses' credibility as to their identifications.

In the instant matter, Gisselle, Juwan, Rondall, Dajah, J.E., and defendant himself all testified that defendant was present at the house on September 4, 2019. Gisselle, Juwan, Rondall, Dajah, and J.E. all testified that they knew defendant because he previously stayed at the house, and Giselle also knew him from high

---

[6] The jury was instructed as to these specific subsections as to the first degree murder charges.

school. J.E. and Juwan both stated defendant shot them. Four witnesses individually identified defendant in a photographic lineup immediately after the shootings. Additionally, surveillance video placed defendant at the scene, and defendant identified himself on that video.

The State presented firearm and DNA evidence that linked defendant to the murders and attempted murders. Sergeant Rauch testified that three of the recovered projectiles were determined to be fired from the same weapon. The projectile recovered from Juwan's body was consistent with a .38 caliber class ammunition. The four .38 special caliber fired cartridge casings that were recovered from the Kia were found to be fired from the same weapon. Sergeant Rauch stated that the projectiles could have been fired from a .38 caliber Smith and Wesson revolver. On August 31, 2019, five days before the shootings, Campbell and defendant were involved in a traffic stop during which a Smith and Wesson revolver was found near where defendant was sitting, and defendant claimed ownership of that revolver at that time.

Blood was found on defendant's pants, shirt, and underwear that he was wearing the night of the shootings. DNA testing from the pants and underwear showed that Juwan could not be excluded from being a major contributor. The result of the DNA testing from the shirt was consistent with Juwan's DNA profile.

Detectives testified that defendant's statements were not consistent with the surveillance videos that were collected the night of the shootings. On appeal, defendant claims that the witnesses only identified him as the shooter because they were familiar with him as a former resident of the household, and he attacks their credibility. Despite defendant's arguments, the jury made a credibility determination after listening to all of the testimony in the matter.

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of

witnesses or re-weigh the evidence. *Lane*, *supra*. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Hutchinson*, 22-536 (La. App. 5 Cir. 8/18/23), 370 So.3d 769, 781, *writ denied*, 23-1296 (La. 2/27/24), 379 So.3d 662. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. *Lloyd*, *supra*. This Court should not second guess credibility determinations. *Nguyen*, 359 So.3d at 122.

In the instant matter, there are not any internal contradictions or irreconcilable conflicts with the physical evidence. The jury heard the testimony, including any inconsistencies, and made a credibility determination. In this case, more than one person testified that defendant was the shooter. While defendant argues that the witnesses are not credible because they smoked marijuana, both Juwan and Gisselle testified that they were not "stoned." However, defendant admitted that he was high that night. J.E. identified defendant as the person who shot her, and there was no evidence that she smoked marijuana. As such, the jury made a credibility determination as to the witnesses' testimony. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. *See State v. Henry*, 13-558 (La. App. 5 Cir. 3/26/14), 138 So.3d 700, 716, *writ denied sub nom. State ex rel. Henry v. State*, 14-962 (La. 2/27/15), 159 So.3d 1064.

### *Conviction for Obstruction of Justice (count five)*

Defendant was convicted of one count of obstruction of justice. The indictment specifically charges defendant with obstruction "by removing the .38 caliber revolver, he used to shoot the victims, off of the crime scene, and/or getting rid of the jacket he was wearing at the time of the murders." The jury was instructed as to both the removal of the gun and/or jacket. At the time the crime

was committed,[7] La. R.S. 14:130.1(A) provided in pertinent part:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers[.]

The Louisiana Supreme Court in *State v. Jones*, 07-1052 (La. 6/3/08), 983 So.2d 95, 101-02, outlined four elements of obstruction of justice that must be met. First, the obstruction must be committed with the knowledge that such act has, reasonably may, or will affect an actual or potential, past, or future criminal proceeding. Second, the defendant must tamper with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. *Id.* Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act and may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *State v. Holliday*, 17-1921 (La. 1/29/20), 340 So.3d 648, 666, *cert. denied*, -- U.S.--, 141 S.Ct. 1271, 209 L.Ed.2d 10 (2021). Third, the statute provides that the tampering be either by the intentional alteration, movement, removal, or addition of any object or substance. Nothing beyond movement of the evidence is required by the statute if accompanied by the requisite intent and knowledge. *Jones*, 983 So.2d at 102; *State v. Tatum*, 09-1004 (La. App. 5 Cir. 5/25/10), 40 So.3d 1082, 1090.

---

[7] The law in effect at the time of the commission of the offense is determinative of the penalty imposed. *State v. Sugasti*, 01-3407 (La. 6/21/02), 820 So.2d 518, 520.

Fourth, the tampering must be done "at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation" by law enforcement officers. *Jones*, *supra* (citing La. R.S. 14:130.1(A)(1)(a)).

As discussed, defendant avers that the State failed to prove he had the specific intent to tamper, alter, or destroy evidence in the police investigation. He argues that because Juwan was shot in the stomach, the blood was on the back of the hoodie and that he was not aware of the blood or the significance of the hoodie to the police investigation. The State essentially argues that when an assailant fails to provide the police with the clothes worn during the offense, adequate proof exists to support an obstruction of justice conviction.

In viewing the evidence in the light most favorable to the prosecution, we find that a rational juror could have concluded that defendant interfered with the results of a criminal investigation or proceeding. The jury appears to have made a credibility determination that defendant was not forthcoming about the jacket. The jury heard defendant's statement to the police. In the statement, he denied that the firearm located during the traffic stop belonged to him. He also said that on the night of the shooting, Campbell left alone before two men came to the house to buy marijuana, that those men went inside, and that one of them shot everyone. Defendant told the officers that he was trying to protect himself and did not have a gun. At trial, defendant admitted to previously lying. The jury heard all of the testimony, viewed all of the evidence, and found defendant was not credible.

Further, a rational juror could have found that based on the small amount of blood visible on defendant's clothing when he went to the police, he likely believed that the clothes he continued to wear could not connect him to the shooting. The jury also appears to have found that the surveillance video shows that he took his jacket off at the scene immediately following the shooting. It is

not the function of the appellate court to re-weigh the evidence. Under these circumstances, we find that defendant's actions were consistent with someone trying to distort or interfere with a criminal investigation or proceeding.[8]

Considering the law and the evidence admitted at trial, we find that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient under the standard set forth in *Jackson* to support defendant's convictions for attempted first degree murder, first degree murder, and obstruction of justice. As such, we affirm the convictions for both counts of attempted first degree murder, both counts of first degree murder, and the count of obstruction of justice.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

There is a discrepancy between the transcript, sentencing minute entry, and the uniform commitment order (UCO) as to the restriction of benefits for defendant's conviction of obstruction of justice. At the time defendant committed the offense,[9] La. R.S. 14:130.1(B)(1) provided:

> B. Whoever commits the crime of obstruction of justice shall be subject to the following penalties:
>
> (1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.

As to the conviction for obstruction of justice, the trial court stated, "As to count five, he will be sentenced to forty years at hard labor in the Department of

---

[8] Because the evidence was sufficient as to the jacket, we need not address the sufficiency as to the gun.
[9] The law in effect at the time of the commission of the offense is determinative of the penalty imposed. *Sugasti*, *supra*.

Corrections." The trial court correctly sentenced defendant, as it did not impose a restriction of benefits. However, the minute entry states, "As to all counts, the sentence's [sic] are to be served without benefit of parole, probation, or suspension of sentence." When there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983). Additionally, the UCO provides, "40 yr/ 0 m/ 0d" in the column labeled "Amount of time to be served without benefit, if applicable" as to count five (obstruction of justice).

Accordingly, we remand the matter for correction of the sentencing minute entry and the UCO to correct this inaccuracy as to the restriction of benefits for count five. Once the UCO is corrected, the Clerk of Court for the 24th Judicial District Court is ordered to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See State v. Allen*, 19-377 (La. App. 5 Cir. 4/30/20), 296 So.3d 1096, 1107, *writ denied*, 20-795 (La. 12/8/20), 306 So.3d 431.

## DECREE

For reasons explained above, we affirm defendant's convictions and sentences. The matter is remanded to the trial court with instructions to correct the sentencing minute entry and the UCO, as stated above.

**AFFIRMED; REMANDED
WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

# NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JULY 31, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 23-KA-472

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE MICHAEL P. MENTZ (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)      DOUGLAS E. RUSHTON, JR. (APPELLEE)      THOMAS J. BUTLER (APPELLEE)

**MAILED**
PRENTICE L. WHITE (APPELLANT)
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
16731 CICERO AVENUE
BATON ROUGE, LA 70816

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053